[Nos. 32040-8-I; 32302-4-I. Division One. June 12, 1995.]

THE STATE OF WASHINGTON, *Respondent*, v. TAFFERO DERAY WRIGHT, AKA KENNETH PRATT, *Appellant.*

THE STATE OF WASHINGTON, *Respondent*, v. MANUEL JIMINEZ ACOSTA, *Appellant.*

Andrew Subin and Patricia Novotny, for appellants.

Gregory Jackson and Michele Hauptman, for respondent.

PEKELIS, J. Pro Tem.* — Taffero Deray Wright (Wright) and Manuel Acosta (Acosta) contend that the trial court erred in ruling that they did not establish a prima facie case that the State's use of its peremptory challenges constituted purposeful discrimination.[1] They claim that the challenges violated their right to equal protection under *Batson v. Kentucky*.[2] We affirm.

# I

## FACTS

### A

### Wright

On July 22, 1992, Wright was charged with taking a motor vehicle without permission. Trial began on November 18, 1992.

During voir dire, defense counsel asked if anyone had ever had to talk to the police. Venire person Mr. Barbee, an African-American, responded and the following dialogue ensued:

Q. How many times have you talked to the police?

A. In my lifetime, lots.

---

*Justice Rosselle Pekelis participated in this case while a member of the Court of Appeals, but signed the opinion as a judge pro tempore pursuant to CAR 21(c).

[1]Because these two appeals contain an identical legal issue, and this court deems it appropriate to resolve the issue in a single opinion, the appeals have been consolidated under cause 32040-8-I.

[2]476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986).

Q. Why?

A. Well, it goes with the territory, with the body that I have.

Q. Can you tell me about that?

A. I come from a visible minority.

Q. Can you explain a little bit why that puts you in contact with the police?

A. I haven't figured that out to this day. But I can tell, experientially, from talking to other people, that I feel like a target.

Q. And why do have those feelings?

A. Experience has taught me that.

Q. Can you give me an example?

A. . . . I've watched civil rights movements that give the impression that there's good cause for my outlook.

Q. So when you have contacts with the police, how do you feel?

A. I feel that I should give the impression of calm but of eloquence, so that they have a sense that I have power but it has the subtlety that's typical of the white infrastructure.

Q. And if you didn't adopt that way of dealing with police, what do you think would happen?

A. They would take up much more of my time and, quite often, my freedom.

Barbee was later questioned by the deputy prosecutor. The dialogue went as follows:

Q. Well, what little you know about the case . . . the defendant is obviously a young male who is of either African American or some type of — you used the word —

A. "Physical minority".

Q. — "minority." Do you feel, based on your beliefs and on your experiences, that Mr. Wright is here because he is a — simply because he's a target?

A. I don't feel that I could decide that at this time. I would have to see the evidence, and the conduct of the courtroom as it unfolded before me would probably be a factor that would influence me as well.

Q. You haven't made that decision yet?

A. No, I have not. I have not.

During voir dire, Ms. Keslor, a European-American venire member, expressed concern about whether a nervous witness could accurately report an event to the police. The State used its first peremptory challenge to excuse Keslor and its second challenge to excuse Barbee. The State used only two more peremptory challenges.

Wright objected to the dismissal of Barbee on the ground that the State had used a peremptory challenge to excuse the only eligible African-American on the panel.[3] The trial court held that Wright had failed to establish a prima facie case of discrimination and the case proceeded to trial. Wright was convicted as charged.

## B

### Acosta

On July 17, 1992, Acosta was charged with delivery of a controlled substance. The trial began on December 3, 1992.

During voir dire, venire member Mr. Gavino said that his son was recently arrested for domestic violence and was treated harshly by the police. He said he believed that the police fabricated an additional charge of obstruction of justice as leverage for negotiating a guilty plea. Gavino also said that he "knew for a fact that some of the police officers twisted their report in such a way that it would be favorable to their case".

Later, defense counsel asked the jurors if any of them spoke Spanish. Mr. Gustilo commented that he knew a few words, but that he was not fluent. In response to questioning about the use of interpreters, Gustilo commented that if there was a blatant mistake in the interpretation of the testimony, it would have a very negative effect on him. Gavino also answered that he could communicate in Spanish.

---

[3]Another African-American venire member had been excused by the court for cause.

When court was reconvened the next day, the deputy prosecutor questioned Gustilo. Gustilo said that his earlier experience on a jury had left him with a negative impression; when asked why, he said:

> I hate to say this, I thought the court personnel in general were rather ill prepared and so was the defense. I was, I could not accept the truthfulness of the witnesses on the other side. It left a pretty poor taste.
>
> However, collectively, I think that we, following instructions from the judge, we arrived, I thought, at the best conclusion that we could. It so happened not guilty. This was a drug case.

The prosecution exercised its first peremptory challenge against Gavino. Then, after the defense exercised a peremptory challenge, the deputy prosecutor challenged Gustilo. Five more jurors were excused, three by the defense and two by the prosecution.

Acosta challenged the deputy prosecutor's use of peremptory challenges to excuse Gustilo and Gavino. He contended that the removal of the only two jurors who spoke Spanish and the only two who appeared Hispanic displayed systematic discrimination against jurors of Acosta's racial heritage.

The court determined that Acosta had failed to establish a prima facie case of discrimination and the case proceeded to trial. Acosta was convicted as charged.

## II
### Prima Facie Case Under Batson

On appeal, Acosta and Wright contend that the trial courts erred in ruling that they failed to establish a prima facie case of purposeful discrimination. We disagree.

"The equal protection clause prohibits a prosecutor from using the State's peremptory challenges to exclude otherwise qualified and unbiased persons from the jury solely by reason of their race". *State v. Sanchez*, 72 Wn. App. 821, 825, 867 P.2d 638 (1994), (citing *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986)).

The defendant bears the burden of establishing a prima facie case that the exclusion of certain jurors represented purposeful discrimination. *Sanchez*, at 825. To meet this burden, *Batson* requires

[f]irst, [the defendant] . . . show the peremptory challenge was exercised against a member of a constitutionally cognizable racial group. Second, the defendant must show that the use of the peremptory challenge and "other relevant circumstances" raise an inference of discrimination. Such circumstances may include a " 'pattern' of strikes against members of a constitutionally cognizable group and the 'prosecutor's questions and statements during *voir dire* examination' ".

(Citations omitted.) *Sanchez*, at 825 (citing *State v. Burch*, 65 Wn. App. 828, 840, 830 P.2d 357 (1992)). If the defendant establishes a prima facie case, then the State must offer a race-neutral explanation for its use of the peremptory challenges. *Sanchez*, at 826.

The trial court's determination of whether there was a discriminatory purpose behind the State's use of its peremptory challenges "will not be set aside unless clearly erroneous". *Burch*, 65 Wn. App. at 841. This same standard applies when reviewing the trial court's determination of whether a prima facie case has been made. *E.g.*, *United States v. Gordon*, 974 F.2d 97, 99 (8th Cir. 1992).

The State concedes that the first prong of *Batson* was established in both cases; Barbee in the one case, Gavino and Gustilo in the other, are members of cognizable racial groups. It contends, however, that Acosta and Wright have failed to establish that other "relevant circumstances" exist here which raise an inference of purposeful discrimination.

Since *Batson*, courts have refined the concept of "other relevant circumstances" which support a prima facie case. Courts have articulated the following examples:

1. Striking a group of jurors that are "otherwise 'as heterogeneous as the community as a whole', sharing race as their only common characteristic". *People v. Hope*, 137 Ill. 2d 430, 453, 560 N.E.2d 849, 859 (1990) (quoting *People v.*

*McDonald*, 125 Ill. 2d 182, 530 N.E.2d 1351 (1988)), *modified on other grounds*, 147 Ill. 2d 315, 589 N.E.2d 503 (1992); *see also Keeton v. State*, 749 S.W.2d 861, 867 (Tex. Ct. App. 1988).

2. Disproportionate use of strikes against a group. *Hope*, at 463.

3. The level of a group's representation in the venire as compared to the jury. *Hope*, at 463.

4. Race of the defendant and the victim. *Hope*, at 464.

5. Past conduct of the state's attorney in using peremptory challenges to excuse all African-Americans from the jury venire. *Keeton*, at 867.

6. Type and manner of state's questions and statements during venire. *Keeton*, at 867.

7. Disparate impact, all or most of the challenges used to remove minorities from jury. *Keeton*, at 867.

8. Similarities between those individuals who remain on the jury and those who have been struck. *Hope*, at 465.

■ This list suggests that when evaluating whether the defense has established a prima facie case of discrimination, a trial court must take into consideration any plausible nondiscriminatory explanations for the strikes against members of a protected group. A pattern of strikes, for example, has been defined in the following manner:

> To create a pattern, strikes should do more than occasionally involve venire members of a certain race. The strikes should affect those members to such a degree *or with such a lack of apparent nonracial explanation as to suggest the possibility of racial motivation . . ..*

(Italics ours). *Hope*, 137 Ill. 2d at 463.

Although the trial court must evaluate whether there is an apparent nondiscriminatory explanation for a set of strikes, it should not elicit the prosecutor's race-neutral explanation *before* determining whether the defense has established a prima facie case. To do so would collapse the *Batson* two-part analysis. *Hope*, at 459-60. If the trial court

concludes no prima facie case exists, the prosecutor is not required to offer a race-neutral explanation.

■ Nevertheless, the prosecutor can state the race-neutral explanation for the record. By so doing, the prosecutor would ensure an adequate record for review should an appellate court disagree with the trial court's ruling that no prima facie case was established. Contrary to Wright's suggestion, such an offer of proof would not render the issue of whether a prima facie case exists moot.

As Wright notes, the court in *Hernandez v. New York*, 500 U.S. 352, 359, 114 L. Ed. 2d 395, 111 S. Ct 1859 (1991) held that "[o]nce a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot". In *Hernandez*, however, the trial court never ruled on whether a prima facie case was established because after the defendant made his *Batson* objection, the prosecutor immediately volunteered her race-neutral explanation. *Hernandez*, at 356, 359. When the trial court rules on whether a prima facie case exists, the issue does not become moot merely because the prosecutor makes an offer of proof as to his or her race-neutral explanation. *People v. Turner*, 8 Cal. 4th 137, 166-67, 878 P.2d 521, 535-36, 32 Cal. Rptr. 2d 762 (1994), *cert. denied*, 131 L. Ed. 2d 564 (1995); *People v. Stiff*, 206 AD.2d 235, 239 (N.Y. Ct. App. 1994).

## A
### Wright

Wright contends that he established a prima facie case because (1) the State excused the only eligible African-American juror and (2) the excused juror relayed a feeling regarding police behavior which is common to many African-American men. The fact that the deputy prosecutor dismissed the only eligible African-American juror is a factor which could raise an inference of discrimination.

The level of a group's representation in the venire as compared to the jury is a relevant circumstance which can suggest a discriminatory motivation. *Hope*, at 453.

At the same time, courts have been hesitant to find a discriminatory motivation in numbers alone. *United States v. Chinchilla*, 874 F.2d 695, 698 (9th Cir. 1989). Again, a "pattern of strikes" is only found when "[t]he strikes . . . affect those members to such a degree *or with such a lack of apparent nonracial explanation as to suggest the possibility of racial motivation*". (Italics ours.) *Hope*, at 462-63.

Here, the trial court found that Barbee's comments about the police suggest that the State's use of its peremptory challenge was not motivated by racial discrimination. Wright, however, argues that because Barbee's opinion of the police was the result of being an African-American male, excusing him on the basis of his views was necessarily a discriminatory act. We disagree.

The *Batson* court was concerned with *purposeful* discrimination by the prosecution. *Batson*, 476 U.S. at 89. It sought to end the exclusion of venire persons because of their race "or on the false assumption that members of [their] race as a group are not qualified to serve as jurors". *Batson*, at 86.

It is, thus, significant that Barbee himself raised the issue of his feelings about the police's treatment of minorities and that most of his comments on the issue were elicited by defense counsel. The only question asked by the deputy prosecutor in this regard was, "Do you feel, based on your beliefs and on your experiences, that Mr. Wright is here because he is a — simply because he's a target?" Nothing in the deputy prosecutor's question or conduct suggested a concern with race per se.

The deputy prosecutor's question merely suggests concern about Barbee's potential bias against the State's main witness, a police officer. The fact that Barbee was not the only venire member excused after expressing concerns about a police officer's testimony is further evi-

dence of the prosecutor's nondiscriminatory motive. The deputy prosecutor also excused Ms. Keslor, a European-American, after she stated misapprehensions about the ability of a nervous witness to accurately report an incident to the police.

Barbee's comments about the police would give any deputy prosecutor a legitimate reason to excuse a juror because of potential bias against a State witness. As a result, we hold that the trial court did not err in ruling that Wright had failed to establish a prima facie case of discrimination.

## B

### Acosta

Acosta claims that a discriminatory pattern of strikes was established when the prosecutor used its first two peremptory challenges to remove the only Hispanics from the venire. The State makes the threshold argument that because Acosta did not argue below that the order in which the challenges were used established a prima facie case, he cannot raise the issue now.[4] We disagree.

The United States Supreme Court has authorized state courts to adopt procedural requirements governing when *Batson* challenges may be raised. *Ford v. Georgia*, 498 U.S. 411, 112 L. Ed. 2d 935, 111 S. Ct. 850 (1991). In *State v. Burch*, 65 Wn. App. 828, 838-39, 830 P.2d 357 (1992), we refused to find that a defendant had waived his right to raise a *Batson* issue for the first time on appeal in the absence of a court rule defining proper procedures for such challenges. Washington has yet to adopt any rule relating to *Batson* challenges. We, therefore, decline to find that Acosta is barred from raising a *Batson* argument for the first time on appeal. To support his contention that he established a prima facie case of discrimination, Acosta

---

[4]At trial, Acosta argued only that given that he is himself Hispanic, dismissal of the only two Hispanic jurors constituted a prima facie case of discrimination. He did not argue that it was significant that the State used its first two peremptory challenges to excuse the Hispanic jurors.

relies on *United States v. Chinchilla, supra.* The *Chinchilla* court ruled that a prima facie case of purposeful discrimination had been established. In reaching this decision, it relied on the fact that the prosecutor had "(1) challenged all Hispanic jurors; (2) used his first peremptory challenge to strike the only Hispanic juror; and (3) exercised his sole challenge to the alternate pool to remove the only other Hispanic in the jury pool". (Footnote omitted.) *Chinchilla*, 874 F.2d at 698.

In *Chinchilla*, however, the court did not discuss any factors that might weigh against finding a prima facie case and, indeed, from the opinion it appears that there were none. Here, however, there were ample reasons for concluding that the strikes against Gavino and Gustilo were not motivated by race.

During voir dire, Gavino said that his son was recently arrested for domestic violence and was treated harshly by the police. He said he believed that the police fabricated an additional charge of obstruction of justice as leverage for negotiating a guilty plea. He also said that he "knew for a fact that some of the police officers twisted their report in such a way that it would be favorable to their case".

 Much of the State's case against Acosta was based on the testimony of police officers. Gavino's apparent bias against the police, therefore, provided a valid reason for the deputy prosecutor to excuse him from the jury.

 Gustilo stated that he had a negative impression of the legal system from the last time he served on a jury. Like Acosta, the defendant in that earlier case was charged with a narcotics offense. Gustilo said that he believed that court personnel in the earlier case had been ill prepared and he had difficulty accepting the truthfulness of the prosecution's witnesses. Nevertheless, he said that the jury arrived at the best verdict they could, not guilty. Gustilo's response indicated that his negative impression of the prosecution and its witnesses might affect his verdict. Gustilo's potential bias constituted a valid

reason for the deputy prosecutor to excuse him from the jury pool.

The presence of these apparent nondiscriminatory reasons for removing Gavino and Gustilo are important because they mitigate against finding a pattern of strikes. *See Hope*, 137 Ill. 2d 462-63. Under the circumstances, we conclude that the trial court did not abuse its discretion when ruling that no prima facie case of purposeful discrimination had been established.

The remainder of this opinion, wherein we address Acosta's other assignments of error, has no precedential value. Therefore, it will be filed for public record in accordance with the rules governing unpublished opinions. *See* RCW 2.06.040.

KENNEDY, A.C.J., and BECKER, J., concur.

Review denied at 127 Wn.2d 1024 (1995).